**UNIVERSITY EDUCATION ASSOCIATION and Minnesota Education Association, Appellants,**

v.

**The REGENTS OF the UNIVERSITY OF MINNESOTA, Respondents,**

**No. C2–83–628.**

Supreme Court of Minnesota.

Aug. 3, 1984.

Rehearing Denied Sept. 28, 1984.

Donald W. Selzer, Jr., Marko J. Mrkonich St. Paul, for appellants.

Thomas A. Keller, III, Dorie H. Benesh, Minneapolis, for respondents.

AMDAHL, Chief Justice.

Appellants, University Education Association (UEA) and Minnesota Education Association (MEA), are certified exclusive bargaining organizations for faculty members at the University of Minnesota campuses in Waseca and Duluth. The UEA and MEA are affiliated and are employee organizations under Minn.Stat. § 179.63, subd. 5 (1982). Respondent, the Board of Regents of the University of Minnesota, is a public employer under Minn.Stat. § 179.63, subd. 4 (1982). This appeal concerns issues raised in the negotiation of the first collective bargaining agreement between the two parties.

On February 6, 1981, the parties met, in the first of 22 meetings, to negotiate a collective bargaining agreement. The ensuing negotiations gave rise to the instant action. Negotiation continued during the pendency of this suit, and on January 21, 1983, the Regents approved a collective bargaining agreement governing all aspects of the employment relationship between the parties except those issues presently before this court. The agreement was effective July 1, 1981, through August 31, 1983. Although the initial agreement has expired and the parties are in the process of renegotiating a new contract, the issues before this court remain relevant and affect the new negotiations.

This action was initiated by the UEA and MEA (hereinafter referred to solely as the MEA) on February 22, 1982. MEA alleged that the Regents committed unfair labor practices, violating the Minnesota Public Employment Labor Relations Act (PELRA), Minn.Stat. §§ 179.61–.76 (1982), through their bargaining conduct. This appeal concerns only three of seven original counts. First, the MEA asserts that the Regents committed an unfair labor practice by refusing to meet and negotiate regarding the criteria, weights and review of promotion and tenure decisions. Second, the MEA alleges that the Regents committed an unfair labor practice by refusing to meet and negotiate regarding the criteria, weights and review of faculty evaluations. Finally, the MEA asserts that the Regents committed an unfair labor practice by refusing to meet and negotiate concerning issues relating to the academic calendar. The Regents argue that these issues are "inherent managerial prerogatives" and, therefore, non-negotiable under Minn.Stat. § 179.66, subd. 1 (1982).

In its original action, the MEA requested declaratory and injunctive relief. The MEA's request for a temporary injunction was denied on March 24, 1982, by the St. Louis County District Court. Subsequently, in November, the parties settled three of the seven issues.

The four remaining issues were submitted to the district court in cross motions for summary judgment. The court granted the Regents' motion for summary judgment on the tenure, faculty evaluation and academic calendar issues on March 16, 1983. MEA's motion concerning the Regents' duty to provide certain documents

and information to the MEA was granted. The MEA appeals the order relating to the tenure, faculty evaluation and academic calendar issues. We affirm the district court and hold that the Regents' refusal to negotiate the tenure and promotion, faculty evaluations and academic calendar issues was not an unfair labor practice under Minn.Stat. § 179.68, subd. 1 (1982).

MEA asserts that tenure and promotion, faculty evaluations and academic calendar have a significant impact on faculty job security, advancement, compensation and work assignment and are terms and conditions of employment. The Regents assert that these issues are matters of inherent managerial policy.

The July 1, 1981, agreement outlines the agreed upon procedure used in granting indefinite tenure. Under this procedure, either the head of an academic department or a probationary faculty member can initiate the process. After the personnel file of the probationary faculty member is reviewed and other applicable information considered, a written notice and agenda for a departmental meeting is distributed to all tenured members of the department. The tenured members vote and the department head submits a written report to the principal administrator concerning the vote and the department head's recommendation. This report is also supplied to the probationary member, who can review or supplement the report.

The principal administrator, upon receipt of the department head's recommendation, reviews the file and that recommendation. The principal administrator prepares a written recommendation which is forwarded to the Provost. Finally, after the Provost's review and written comments are forwarded to the Vice President for Academic Affairs, the Vice President recommends a course of action to the Regents.

The substantive criteria used to determine whether tenure should be conferred on a probationary member are documented and available to the public. Tenure is based upon the following four criteria:

1. teaching effectiveness and advising of students;
2. distinction in research, writing or artistic production;
3. contributions to the school and/or community; and
4. length of service.

The first two criteria are considered primary although none of the criteria is specifically weighted. Evidence relating to each criterion must be presented and become part of the probationary member's personnel file.

> The standards must of course be applied fairly. To do this requires that the standards be overtly applied on the basis of evidence gathered and presented with specific reference to them, and not left wholly to the inner reflections of those who participate in making the recommendation.

Koffler Memorandum of November 1, 1975, at 5.

The evaluation of faculty members is multifaceted and occurs annually. Evaluation by students, faculty peers and the faculty member may be placed in the faculty member's personnel file.

Vacation and workload are governed by the July 1, 1981, agreement. Whether the academic calendar is based on the quarter or semester system, however, presently remains a managerial decision.

The Regents and MEA have reached an agreement concerning the procedural aspects of the promotion and tenure process at UMD and UMW. The Regents, however, refuse to negotiate the grievability of whether promotion and tenure is granted and the substantive criteria governing these decisions.

*PELRA*

The ultimate issue in this case is whether the Regents have committed an unfair labor practice under Minn.Stat. § 179.68, subd. 2(5) (1982). Section 179.68, subd. 2, provides:

> Public employers, their agents or representatives are prohibited from:
>
> *　　*　　*　　*　　*　　*

(5) refusing to meet and negotiate in good faith with the exclusive representative of its employees in an appropriate unit;

Under Minn.Stat. § 179.63, subd. 16 (1982), the "meet and negotiate" process contemplates mutual good faith negotiations between the employee organization and the public employer.

PELRA specifically outlines the rights and obligations of public employees and employers. With respect to negotiations, Minn.Stat. § 179.65, subd. 4 (1982), provides:

> Publc employees through their certified exclusive representative have the right and obligation to meet and negotiate in good faith with their employer *regarding grievance procedures and the terms and conditions of employment,* but such obligation does not compel the exclusive representative to agree to a proposal or require the making of a concession.

(Emphasis added). The rights and obligations of employers relating to negotiations are set forth in Minn.Stat. § 179.66, subd. 1, 2 (1982), which provides in pertinent part as follows:

> Subd. 1. A public employer *is not required to meet and negotiate on matters of inherent managerial policy, which include, but are not limited to, such areas of discretion or policy as the functions and programs of the employer, its overall budget, utilization of technology, the organizational structure and selection and direction and number of personnel.* \* \* \*
>
> Subd. 2. A public employer has an obligation to meet and negotiate in good faith with the exclusive representative of

the public employees in an appropriate unit regarding grievance procedures and the terms and conditions of employment, but such obligation does not compel the public employer or its representative to agree to a proposal or require the making of a concession.

(Emphasis added).

The negotiations contemplated by Minn. Stat. § 179.63, subd. 16 (1982), require employers and employee representatives to meet and negotiate with respect to terms and conditions of employment. Terms and conditions of employment:

> mean[s] *the hours of employment, the compensation therefor* including fringe benefits except retirement contributions or benefits, and *the employer's personnel policies affecting the working conditions of the employees.* In the case of professional employees the term does not mean educational policies of a school district. The terms in both cases are subject to the provisions of section 179.66 regarding the rights of public employers and the scope of negotiations.

Minn.Stat. § 179.63, subd. 18 (1982). (Emphasis added). Resolution of this case requires a determination whether the tenure and promotion, faculty evaluation and academic calendar issues are terms and conditions of employment under Minn.Stat. § 179.63, subd. 18 (1982).

■ This court has repeatedly emphasized that the purpose of PELRA requires "the scope of the mandatory bargaining area to be broadly construed so that the purpose of resolving labor disputes through negotiation could best be served."[1] *International Brotherhood of Teamsters, Local No. 320 v. City of Min-*

---

1. *See, e.g., Minnesota Arrowhead District Council 96 of American Federation of State, County and Municipal Employees v. St. Louis County,* 290 N.W.2d 608, 610–11 (Minn.1980) (hereinafter *Arrowhead*); *General Drivers Union Local 346 v. Independent School District No. 704,* 283 N.W.2d 524, 527 (Minn.1979) (hereinafter *General Drivers*); *City of Richfield v. Local No. 1215,* 276 N.W.2d 42, 49 (Minn.1979) (hereinafter *Richfield*). Cases decided prior to *Arrowhead* concerning whether certain issues were "terms

and conditions of employment" reflected a reluctance on the part of this court to characterize an issue as non-negotiable. *See Minneapolis Federation of Teachers Local 59 v. Minneapolis Special School District No. 1,* 258 N.W.2d 802 (Minn.1977); *International Union of Operating Engineers, Local No. 49 v. City of Minneapolis,* 305 Minn. 364, 233 N.W.2d 748 (1975) (hereinafter *Operating Engineers*); *International Brotherhood of Teamsters, Local 320 v. City of Minneapolis,* 302 Minn. 410, 225 N.W.2d 254 (1975).

*neapolis,* 302 Minn. 410, 415, 225 N.W.2d 254, 257 (1975). Our recent decisions, however, recognize also that many inherent managerial policies concomitantly and directly affect the terms and conditions of employment. *See St. Paul Fire Fighters, Local 21 v. City of St. Paul,* 336 N.W.2d 301, 302 (Minn.1983); *Ogilvie v. Independent School District No. 341,* 329 N.W.2d 555, 558 (Minn.1983); *Minneapolis Association of Administrators and Consultants v. Minneapolis Special School District No. 1,* 311 N.W.2d 474, 476 (Minn.1981); *Arrowhead,* 290 N.W.2d 608, 611 (Minn. 1980). These recent decisions indicate that the clear distinction intended by the legislature between "terms and conditions of employment" and "matters of inherent managerial policy" has become far from distinct.

This court has recognized that "areas of 'inherent managerial policy' and 'terms and conditions of employment' oftentimes overlap." *St. Paul Fire Fighters, Local 21 v. City of St. Paul,* 336 N.W.2d 301, 302 (Minn.1983) (hereinafter *St. Paul Fire Fighters*). *See Arrowhead,* 290 N.W.2d 608, 611 (Minn.1980)

A decision in respect of a matter of inherent managerial policy—a discretionary decision which a public employer is not required to negotiate—may well impinge upon negotiable terms and conditions of employment. Minn.Stat. § 179.-66 (1982). The impact upon the terms and conditions of employment of an inherent managerial policy decision does not, however, render the policy decision a subject of mandatory negotiation if the decision and its implementation are so inextricably interwoven that requiring the public employer to meet and negotiate the method of carrying out its decision would require the employer to negotiate the basic policy decision. *See Minneapolis Association of Administrators and Consultants v. Minneapolis Special School District No. 1,* 311 N.W.2d 474, 476–77 (Minn.1981). If, however, the inherent managerial policy decision is severable from its implementation, the effect of implementation on the terms and conditions of employment is negotia-

ble to the extent that negotiation is not likely to hamper the employer's direction of its functions and objectives. *Minneapolis Federation of Teachers, Local 59 v. Minneapolis Special School District No. 1,* 258 N.W.2d 802, 805 (Minn.1977); *International Union of Operating Engineers v. City of Minneapolis,* 305 Minn. 364, 233 N.W.2d 748 (1975).

*St. Paul Fire Fighters,* 336 N.W.2d at 302.

■ *St. Paul Fire Fighters* provides a logical analytic framework for cases involving issues that are not clearly identifiable as "terms and conditions of employment." *See also Minneapolis Federation,* 258 N.W.2d 802, 805–06 (Minn.1977) (if policy is separable from implementation that directly affects terms and conditions, then implementation is negotiable). Under *St. Paul Fire Fighters,* the impact a particular policy decision has upon terms and conditions of employment is determined. If the policy does "impinge upon negotiable terms and conditions of employment," 336 N.W.2d at 302, then we are required to determine whether the policy and terms and conditions are so "inextricably interwoven" that negotiation of the issue involves negotiation of the policy. Thus, the second prong of *St. Paul Fire Fighters,* entails ascertaining whether the policy and its implementation are separable. If the policy and its implementation are distinct, then negotiation is mandatory with respect to issues relating to the implementation of the policy. *See Minneapolis Federation,* 258 N.W.2d 802, 805–06 (Minn.1977).

*Tenure*

1. From the Regents' perspective, tenure policies significantly affect the educational goals of a particular institution. Higher standards concerning degree qualifications and publication, for example, influence the reputation and quality of an institution. Moreover, tenure policies also tend to have an impact on an institution's fixed future costs. In contrast to tenure and promotion decisions which affect certain individuals, the specific substantive criteria, weights and review policies concern-

ing faculty evaluations affect all faculty members. These policies are expressions of the educational standards that the Regents feel necessary to maintain—they are used to measure the quality of work of all faculty members. The Regents have consistently maintained that the criteria, weights and review of faculty evaluations are non-negotiable issues.

■ Tenure is defined, in the academic setting, as a faculty appointment for an indefinite period of time. A tenured faculty member enjoys substantial job security because tenured faculty members can only be removed for cause; any other removal is through retirement or retrenchment due to financial necessity. In addition, tenured status is accompanied by increased prestige, compensation and freedom.

■ The tenure and promotion policies of an academic institution pertain to both the educational objectives of the institution and the terms and conditions of employment. *Operating Engineers*, 305 Minn. 364, 233 N.W.2d 748 (1975), is the only Minnesota case that directly addresses the negotiability of a public employer's promotion policies. *Operating Engineers* also implies that certain facets of an employer's promotion policies are severable from the policies involving inherent managerial discretion.

In *Operating Engineers*, the employee organization sought certain specific information relating to the process used to select employees for promotion. The *Operating Engineers* decision recognized that promotion policies were a mixture of severable managerial policy and terms and conditions of employment.

Appellant also argues that all matters relating to selection of personnel for promotion are exempt from the scope of the PELRA, basing the argument on § 179.-66, subd. 1, which excepts from mandatory negotiation "matters of inherent managerial policy." This argument does not apply to the issue in this case, however. Appellant is correct in stating that the decision to administer competitive examinations is not subject to negotiation.

However, this dispute does not concern the question of the propriety of using competitive examinations. Rather it relates to the fairness of a specific given examination, and as such it is a dispute involving terms and conditions of employment and subject to negotiation under the PELRA and not a matter of inherent managerial policy. Therefore, the duty to supply information clearly applies.

305 Minn. at 372–73, 233 N.W.2d at 754.

*Operating Engineers* contrasts with *Minneapolis Federation of Teachers, Local 59 v. Minneapolis Special School District No. 1*, 258 N.W.2d 802 (Minn.1977). In *Minneapolis Federation*, we held that the decision to transfer a number of teachers was a managerial decision directly concerning the educational objectives of a school district, but that the "criteria for determining which teachers are to be transferred * * * involves a decision * * * [that is] negotiable." 258 N.W.2d at 805. *Minneapolis Federation* is significant because of the dicta recognizing the managerial character of educational objectives. Moreover, there is a crucial distinction between the instant case and *Minneapolis Federation*. In *Minneapolis Federation* we determined that the criteria used to determine whether an employee will be transferred from one working place to another were not irreversibly intertwined with the educational objectives of a school district. The substantive criteria used to determine whether a faculty member should be granted tenure, however, *are* irreversibly intertwined with the educational policies and objectives of the University of Minnesota.

■ The decision to use a civil service exam in order to determine whether an employee was eligible for promotion was recognized, in *Operating Engineers*, as a matter of inherent managerial policy. The exam presumably tested an employee's knowledge in areas perceived by the employer to be important. In other words, the exam evaluated an employee's competence in subjects the employer deemed as

essential; there was no question that the employer's selection of subjects to be tested was a matter of inherent managerial policy. Similarly, the Regent's decision to select certain substantive criteria as controlling eligibility for tenure or promotion are matters of inherent managerial policy.[2]

The subjective criteria used to determine promotion and tenure are direct reflections of the educational policy objectives of the Regents. This inherent managerial policy is severable from its implementation. Hence the Regents have agreed to negotiate the procedures (implementation) used to determine tenure and promotion.

The initial agreement between the Regents and the MEA ensured fairness and grievability for promotion and tenure decisions.[3] Section 201.480 related to the finality of any promotion or tenure decision:

The decision, the criteria upon which such decision was made, all recommendations leading us to the decision and the reasons for such recommendations *shall not be grievable. The Member may bring a grievance alleging that the procedure* for promotion or conferral of Indefinite Tenure described in this Section 201.400 was not followed, * * *.

Agreement between Regents of University of Minnesota and UEA at 21 (July 1, 1981 —August 31, 1983). Section 800.000 *et seq* of the collective bargaining agreement provides a grievance procedure as required by PELRA. *See* Minn.Stat. § 179.70, subd. 1 (1982). The sole remedy of a faculty member who prevails in grievance is an order to reconsider tenure or promotion. Grievability of the ultimate decision would effectively subject the substantive criteria and their application to review and would seriously impinge upon the Regents' ability to formulate a consistent and coherent academic policy. Perhaps the best description of the discretion needed in making tenure decisions is found in the Fourth Circuit case of *Clark v. Whiting*, 607 F.2d 634, 639–40 (4th Cir.1979).

A teacher's competence and qualifications for tenure or promotion are by their very nature matters calling for highly subjective determinations, determinations which do not lend themselves to precise qualifications and are not susceptible to mechanical measurement or the use of standardized tests. These determinations are in "an area in which school officials must remain free to exercise their judgment" especially since these de-

---

**2.** In contrast, the fairness of the specific questions used on a civil service exam and the grading of individual exams are analogous to the objective and fair application of the tenure or promotion criteria to specific individuals. These are negotiable terms and conditions of employment.

**3.** Due process is not an issue in this case but does merit brief comment. Even though the negotiated grievance procedure provides faculty members with a substantial amount of procedural due process, it is important to mention that tenure decisions by state educational institutions have propagated a multitude of due process decisions in the federal courts. *See, e.g., Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593 (1972); *Beitzell v. Jeffney*, 643 F.2d 870 (1st Cir.1981); *Clark v. Whiting*, 607 F.2d 634 (4th Cir.1979); *Chung v. Park*, 514 F.2d 382 (3rd Cir.1975). "[E]very court * * * found to have considered the matter has held that, in the absence of unusual circumstances, a probationary university employee has no 'property' interest in obtaining tenure." *Beitzell*, 643 F.2d at 875.

Although these cases focus on due process as opposed to terms and conditions of employment and the negotiability of tenure criteria under PELRA, they do buttress our holding that the criteria, weights and review of tenure and promotion decisions are matters of "inherent managerial policy" under Minn.Stat. § 179.66, subd. 1 (1982).

The tenure due process cases are interesting because of the universal recognition of the inherent discretion necessary for informed decision making by university administrations in conferring tenure on faculty members. For example, in *Chung v. Park*, 514 F.2d 382, 387 (3rd Cir.1975), the Third Circuit noted:

Moreover, the administration of the internal affairs of a college and especially the determination of professional competency is a matter peculiarly within the discretion of a college administration.

Due process should not be employed to insure that this exercise of discretion is "wise" but only that it is not unreasonable, arbitrary or capricious.

*Id.* (footnotes omitted).

terminations present unique questions for judgment by those with expertise in the specialized academic area, capable of making professional evaluations of those elusive and intangible qualities and talents expected of the scholar and teacher.

*Id.* (footnotes omitted).

*Faculty Evaluation*

■ 2. The MEA argues that the faculty has a direct interest in assuring that evaluations are fair, accurate and properly used. The faculty evaluation issue relates to all faculty and consequently is an issue separate from tenure and promotion.

The substantive criteria, weights and review of faculty evaluations are undoubtedly managerial matters while the application of the evaluations is an issue that may directly affect a faculty member's terms and conditions of employment. The fairness of the application of faculty evaluation standards is ensured by the negotiability of the tenure and promotion procedural process. It is obvious that the quality of work an employer, public or private, expects is a managerial decision.

*Academic Calendar*

■ 3. The MEA has attempted to negotiate the academic calendar with the Regents. The Regents will only negotiate concerning the issues of holidays and vacations. Whether the academic calendar is based on a quarter or semester system and when the quarter or semester starts are alleged to be matters of inherent managerial discretion by the Regents.

MEA's arguments that the academic calendar is a term and condition of employment as opposed to an inherent managerial decision are not well founded. There is overwhelming support for the Regents' position that the academic calendar is a matter of inherent managerial policy. *See Kenai Peninsula Borough v. Kenai Peninsula Education Association,* 572 P.2d 416 (Alaska 1977); *West Hartford Education Association v. DeCourcy,* 162 Conn. 566, 295 A.2d 526 (1972); *City of Biddeford v. Biddeford Teachers Association,* 304 A.2d 387 (Me.1973); *Burlington County College Faculty Association v. Board of Trustees,* 64 N.J. 10, 311 A.2d 733 (1973).

When the school year begins and ends is comparable to when a work day begins and ends. The decision is made by management and controlled by the objectives and goals of the particular institution. Although employees are entitled to negotiate the number of hours worked, *see* Minn. Stat. § 179.63, subd. 18 (1982), it does not follow that employees can negotiate *when* an employer deems it necessary to report to work. To allow employees to negotiate such a policy would involve negotiation of the actual objectives and goals of an employer.

In conclusion, the district court's determination that the tenure and promotion, faculty evaluation and academic calendar issues are not terms and conditions of employment under Minn.Stat. § 179.63, subd. 18 (1982), is correct. The Regents, therefore, did not commit an unfair labor practice under Minn.Stat. § 179.68, subd. 2 (1982).

Affirmed.

YETKA, Justice (dissenting).

After a long history of constructing broadly the mandatory bargaining area under PELRA in order to serve the purpose of resolving labor disputes through negotiation, this court now narrows the scope of mandatory bargaining. I feel that today's decision is contrary to the purpose of PELRA, and I therefore dissent.

As the majority opinion notes, many inherent managerial policies impinge upon negotiable terms and conditions of employment. The test we have established for determining whether such policies must be negotiated inquires into the degree to which the managerial policy decision is severable from the implementation of that policy. *St. Paul Fire Fighters, Local 21 v. City of St. Paul,* 336 N.W.2d 301 (Minn. 1983).

For example, the decision to use a civil service exam in order to determine whether an employee is eligible for promotion im-

pinges strongly on the terms and conditions of employment. The decision to use the exam is undoubtedly a matter of inherent managerial policy. The fairness of the particular exam used, however, is a separate issue involving the implementation of that policy and is therefore negotiable. *International Union of Operating Engineers, Local No. 49 v. City of Minneapolis*, 305 Minn. 364, 233 N.W.2d 748 (1975). Similarly, the decision to transfer a number of teachers was a managerial decision directly concerning the educational objectives of a school district, but the "criteria for determining which teachers are to be transferred * * * involves a decision * * * [that is] negotiable." *Minneapolis Federation of Teachers, Local 59 v. Minneapolis Special School District No. 1*, 258 N.W.2d 802, 805 (Minn.1977).

In this case, I have no quarrel with the majority's classification of the criteria used in promotion and tenure decisions as a matter of inherent managerial policy. Certainly these criteria reflect the educational policy objectives of the Regents. However, I disagree with the conclusion that the grievability of individual promotion and tenure decisions is not a mandatory bargaining subject.

There can be no doubt that promotion and tenure directly affect the terms and conditions of employment. The majority has no problems with requiring collective bargaining on the *procedures* surrounding promotion and tenure decisions, concluding that the procedures are a severable implementation of the general promotion and tenure policy. However, the majority does not believe that *grievability* is severable from the policy: "Grievability of the ultimate decision would effectively subject the substantive criteria and their application to review * * *." Majority opinion at 541.

Clearly, the grievance of a particular promotion and tenure decision would not necessitate review of the criteria established for determining tenure; it would only ensure that the established criteria were rationally and fairly applied. Fair procedures can only go so far in guaranteeing

just decisionmaking. Precluding grievance of tenure and promotion decisions renders any negotiated procedural fairness meaningless in cases where the procedures have been satisfied, but the criteria have been misapplied or ignored. The grievability of allegedly erroneous decisions is entirely separate from the criteria upon which the University wishes to base those decisions. Because grievability is severable from implementation of the promotion and tenure policy, it is a negotiable term and condition of employment.

I also agree that the criteria, weights and review policies used in faculty evaluations are inherently managerial issues because they are expressions of the educational standards the Regents desire to establish and maintain. The quality of work an employer expects is obviously a managerial decision.

The majority admits that the application of faculty evaluations is an issue that may directly affect a faculty member's terms and conditions of employment. However, the majority asserts that the fairness of the application of the faculty evaluations is ensured by the negotiability of the tenure and promotion process.

As discussed above, there is only a guarantee of *procedural* fairness in the tenure and promotion process. There is no assurance that faculty evaluations will be justly made or fairly applied because the grievability of their conclusions and use is precluded from negotiation. The fairness of the application of faculty evaluation standards should be negotiable in a manner similar to the implementation of tenure and promotion decisions.

Thus, I would reverse the trial court on its determination that faculty evaluations and tenure matters are not negotiable. I do not dissent on the question of the academic calendar because, although employees are entitled to negotiate the number of hours worked, it does not follow that employees can negotiate when an employer deems it necessary to report to work.

TODD, Justice (dissenting).

I join in the dissent of Justice Yetka.

SCOTT, Justice (dissenting).

I join in the dissent of Justice Yetka.

WAHL, Justice (dissenting).

I join the dissent of Justice Yetka.