LAW ENFORCEMENT LABOR
SERVICES, INC., Respondent,

v.

COUNTY OF HENNEPIN and Donald
Omodt, as Hennepin County Sheriff,
Petitioners, Appellants.

No. CX–88–2341.

Supreme Court of Minnesota.

Jan. 5, 1990.

Karla F. Hancock, Asst. County Atty., Minneapolis, for appellant.

Marylee Abrams, Bloomington, for respondent.

Richard D. Hodson, amicus curiae for Minn. State Sheriff's Assn., Stillwater.

Brian F. Rice, John P. Boyle, amicus curiae for Police Officers Federation of Mpls. and MN Law Enforcement Ass'n.

Corrine A. Heine, amicus curiae for MN Chiefs of Police Ass'n.

KELLEY, Justice.

In April of 1970, the Hennepin County Sheriff's Department established and implemented a program providing for uniform and grooming standards for department personnel. Later, in 1974, that policy was amended or updated by a more comprehensive policy which addressed, among other concerns, standards prescribing hair style, mustache length, and general appearance. Later still, in 1978, the uniform provisions of the policy were modified. Between 1970 and 1988 no collective bargaining unit representing any of the personnel of the sheriff's department requested negotiation of any of the grooming standards, nor did any bargaining units, as such, participate in the formulation or implementation of any of those standards.

During the 1985 calendar year, a committee consisting of representatives from management, individual employees, who were members of the Law Enforcement Labor Services, Inc. Local 19 (LELS) (the

exclusive bargaining agent for approximately 300 uniformed and other essential employees of the sheriff's department), and individual employees who were members of other collective bargaining units in the department, discussed, drafted, and reviewed for the department the general personnel grooming policy which is here in issue and which was finally implemented by Hennepin County Sheriff Donald Omodt on May 16, 1988. However, the respondent LELS did not participate in either the establishment or implementation of the policy in its bargaining unit capacity.

After Sheriff Omodt ordered implementation of the revised personnel grooming policy, as recommended by the ad hoc committee, the respondent LELS, as exclusive bargaining agent for the deputies, sought to enjoin its implementation. LELS claimed that by implementing the new policy without first having negotiated with the union, Sheriff Omodt had committed an unfair labor practice, because, it claimed, the standards in the policy related to "terms and conditions of employment" as that phrase is defined by the Public Employment Labor Relations Act (PELRA), Minn.Stat. § 179A.03, subd. 19 (1988). The sheriff's defense was bottomed on the statutory exclusion relieving a public employer from the duty to negotiate "matters of inherent managerial policy." Minn.Stat. § 179A.07, subd. 1 (1988). The trial judge originally assigned to the case granted the union a temporary injunction. Another trial judge, later named to hear the case on the merits, after a full hearing vacated the temporary injunction which had been entered, and granted Sheriff Omodt's summary judgment motion. The court of appeals reversed. *Law Enforcement Labor Servs., Inc. v. County of Hennepin*, 438 N.W.2d 438 (Minn.App.1989).

Because we conclude that the respect and confidence of the public, who elects him and whom he serves, is integral to the sheriff's success in discharging the law enforcement duties entrusted to him by statute, we hold that the establishment and

implementation of a personnel grooming policy designed to foster and enhance that respect and confidence, involves a matter of "inherent managerial policy" as defined in Minn.Stat. § 179A.07, subd. 1 (1988). Therefore, we reverse and remand to the district court for reinstatement of the judgment.

The grooming policy for the sheriff's department has been historically contained within the department manual furnished each department employee when hired. Each employee is required to acknowledge in writing that he or she received the manual and will comply with its requirements. Preliminary thereto, during the hiring process, each prospective employee has been asked on the Application Interview Form whether the applicant objects to conforming to a reasonable dress and grooming policy prescribed by the sheriff. The appellant on the same form must answer the question: "Do you feel any objection or resentment at accepting and following orders from lawful superiors even though you disagree * * * ."

In May 1988, when the amended grooming policy here involved was distributed, each employee was additionally required to sign a statement that the employee had "read, understood and inserted in my manual of Department Rules and Regulations the new attached grooming policy." The revised policy differs from previous policies in only two material respects: hair length and mustache length requirements were relaxed, and a prohibition against unusually long, gaudy, or pretentious fingernails was added. Specifically, the policy requires that "[o]n duty uniformed personnel and on duty deputies shall keep their nails trimmed so as not to extend more than ⅛″ beyond the end of the finger and shall be rounded (i.e., not trimmed to point). No ornament associated with the nails may be employed. No nail color may be worn if the appearance that results is so gaudy, pretentious or unusual as to attract undue attention." [1]

---

**1.** Shortly after implementation of the revised policy, two male deputies were disciplined for noncompliance with mustache restrictions.

One female deputy, upon refusal to comply with the maximum fingernail length restriction, was

The issue we address is whether the implementation of the amended grooming policy involves a "term and condition of employment" which is subject to mandatory bargaining. PELRA imposes upon a public employer "an obligation to meet and negotiate in good faith * * * regarding grievance procedures and the terms and conditions of employment * * *." Minn.Stat. § 179A.07, subd. 2 (1988). PELRA defines "terms and conditions of employment" as hours, benefits and "the employer's personnel policies affecting the working conditions of the employee." Minn.Stat. § 179A.03, subd. 19 (1988). In order to implement PELRA's underlying public policy of promoting orderly and constructive relationships between all public employers and their employees (Minn.Stat. § 179A.01 (1988)), the courts of this state have traditionally construed the statutory mandate broadly. *See, e.g., Univ. Educ. Ass'n v. Regents of the Univ. of Minnesota*, 353 N.W.2d 534, 538 (Minn.1984). Yet, as we continued to iterate that construction rule, we simultaneously recognized that it may be limited if the matter in dispute involves an inherent managerial policy. Moreover, we have acknowledged that there are close cases in which "inherent managerial policy" overlaps upon the "terms and conditions of employment" requiring the use of a discreet analysis, which may involve a weighing of conflicting policy considerations. *See, e.g., Univ. Educ. Ass'n v. Regents*, 353 N.W.2d at 539.[2]

The trial court recognized that this case presented a question involving such an overlap. However, in its attempt to delineate the distinction between the two apparently conflicting statutory mandates, the trial court employed a balancing test novel to Minnesota law. The test used was "whether the matter *substantially* affects the public employee's interest in wages, hours or employment so that it necessarily *outweighs* the public employer's fundamental interest in effectively accomplishing the duty of the public service in question." (Emphasis supplied). Three factors were then balanced: (1) the impact the personnel policy has on an employee's wages, hours or work conditions, (2) whether the matter is fundamental to the public service's organizational structure, existence, or selection and direction of personnel, and (3) the public's right to protection of its health, safety and welfare.

▮ That test injects into the analysis a largely subjective element—to-wit, whether the matter "substantially affects" the public employee's interest in wages, hours, and conditions of employment to the extent it "outweighs" the public employer's fundamental interest. Contrasted to that approach is. the traditional Minnesota approach wherein by judicial decision we have augmented the legislative policy to afford wide scope bargaining while at the same time attempting to circumscribe that scope when it conflicts with statutory restrictions against intrusion on the area of managerial authority. We have, for example, observed that "many inherent managerial policies concomitantly and directly affect the terms and conditions of employment." *Univ. Educ. Ass'n v. Regents*, 353 N.W.2d at 539. However, from the mere fact that a managerial decision does have an impact on "terms and conditions" of employment, it does not automatically follow that the policy decision is subject to mandatory bargaining. If the policy decision (here the establishment of the grooming policy itself) is so intrinsically interwoven with its implementation that to require the public employer to negotiate its implementation would also force it to negotiate the underlying policy decision, no negotiation is required. *See St. Paul Fire Fighters, Local 21 v. City of St. Paul*, 336 N.W.2d 301, 302 (Minn.1983). Thus, to decide whether negotiation is required, the court must first

---

likewise disciplined, and, when she continued her refusal, was ultimately terminated.

**2.** PELRA excludes from the employer's general obligation to negotiate those matters that are defined in the Act as involving "inherent managerial policy" which " * * * include, but are not limited to, such areas of discretion or policy as the functions and programs of the employer, its overall budget, utilization of technology, the organizational structure, selection of personnel, and direction and the number of personnel." Minn.Stat. § 179A.07, subd. 1 (1988).

determine whether the public employer's management decision has an impact on "terms and conditions of employment." If it does, the court must then further ascertain whether the establishment of the policy is distinct and separable from its implementation. If the two are not so distinct and separate, negotiation is not required. *Univ. Educ. Ass'n v. Regents,* 353 N.W.2d at 539.

The appellant urges us to expand that two-step analysis by appending thereto the balancing approach, which the trial court employed, and which has been applied in several other jurisdictions in similar situations. *See, e.g., Metro. Technical Community College Educ. Ass'n v. Metro. Technical Community College Area,* 203 Neb. 832, 839–43, 281 N.W.2d 201, 205–06 (1979); *Dunellen Bd. of Educ. v. Dunellen Educ. Ass'n,* 64 N.J. 17, 29, 311 A.2d 737, 743 (1973); *Burlington City College Faculty Ass'n v. Bd. of Trustees,* 64 N.J. 10, 13, 311 A.2d 733, 735–36 (1973); *Nat'l Educ. Ass'n v. Bd. of Educ.,* 212 Kan. 741, 753, 512 P.2d 426, 435 (1973) (superseded by statutory amendments; *see Garden City Educators' Ass'n v. Vance,* 224 Kan. 732, 735, 585 P.2d 1057, 1061 (Kan.1978)). As did the court of appeals' panel, we decline to do so; but, in contrast to the court of appeals' panel, we nonetheless affirm the judgment entered in the trial court because we conclude that even by application of our traditional test, the ultimate result should be the same.

The utilization of the trial court's balancing test appears superficially attractive: the public employer is required to negotiate only if the policy "substantially impinges" upon the statutory rights of the employees. Upon closer analysis, however, we conclude that in application, the addition of a "balancing factor" of this nature to the analysis not only fails to provide a certain and easily ascertainable bench mark, but, to the contrary infuses into the weighing analysis considerably more subjectivity than does our traditional test. Moreover, it appears

to us that introduction of the balancing factor underplays the emphasis that both the legislature and this court have traditionally afforded to the "terms and conditions of employment" factor. To limit the public employer's statutory obligation to bargain to only those instances where an employer promulgated policy "substantially impacts" on the "terms and conditions of employment" creates a largely subjective limitation that may be inconsistent with policies underlying PELRA (Minn.Stat. § 179A.01 (1988)), and, as well, our cases which have broadly interpreted the scope of the statutory phrase "terms and conditions of employment" in order to encourage labor negotiation in resolution of public employee-employer disputes.

The two step test Minnesota has traditionally employed under PELRA is no anachronism. Its employment substantially eliminates subjectivity and discretion, because the examination focuses on whether the policy has any impact on the terms and conditions of employment, and, if so, whether establishment and implementation are separable regardless of "how much" the impact may be.[3]

■ Because the grooming policy has nothing to do with traditional areas of collective bargaining—hours, job security, wages, or benefits—it is a "term and condition of employment" only if it "affects the working conditions of employees." Respondent argues there is "no doubt" that the policy affects the employee's working condition. Appellant counters that "the plain meaning of the statute" demonstrates that both the establishment and implementation of a personnel grooming policy relate to inherent managerial matters. Each party cites cases from this and other jurisdictions purporting to support its respective position. However, neither appears to place heavy reliance on the cited cases, nor, in our opinion, should it. Careful examination of the cases cited to support either

---

**3.** By our rejection of the proposed "balancing test" in this case, we do not necessarily foreclose its employment when the inquiry focuses on the *establishment* of a policy. That issue, however, is not before us in this case. Respondents ac-

knowledge the sheriff's right to establish the grooming policy. This concession leaves the only issue before us one to determine whether negotiation of the *implementation* of the policy is statutorily required.

position reveals that those cases are distinguishable or not particularly persuasive because almost all pivot on the existence of the particular factual situation involved. On balance, and although the question is close, we join the courts below in their conclusion that Sheriff Omodt's 1988 modified grooming policy does have some impact on the working conditions of the deputy sheriffs that are members of this union.[4]

Thus, negotiation of the implementation of the personnel grooming policy is required unless its establishment and its implementation are so interwoven and inseparable as to defeat the functions and objectives of the policy. The respondent union suggests that in this case implementation can be severed from establishment because the specific format of the policy, sanctions for noncompliance, and the specific standards established are all distinct from the policy decision itself. We disagree. Since the respondent conceded that the establishment of a grooming policy for deputies is a matter of inherent managerial policy, its present contention that the specific format, or, in other words, the actual wording employed in the policy, is negotiable leaves for negotiation only questions relating to form rather than substance. Second, sanctions for noncompliance already are bargained and the existing collective bargaining agreement, to which these litigants are parties, provides a comprehensive procedure for the imposition of sanctions.[5]

Finally, the remaining item that respondent suggests be separable relates to the specific grooming standards themselves. It seems to us, as it did to the trial court, that defining particular grooming standards relates more to the establishment

than to the implementation of the policy, but to the extent that they do relate to implementation, it appears to us equally clear that they are inseparable from the establishment of the overall grooming policy for departmental personnel. Consequently, we must reject respondent's contention. The respondent union cited a host of cases from the private sector relating to dress code, on-the-job behavior, and other similar matters. The cases cited, however, have little bearing on the issue in this case. Those cases primarily involve health, hygiene, or safety matters—issues not involved here. Sheriff Omodt's personnel grooming policy, in contrast, is primarily designed to establish a departmental public image of neatness and professionalism, but in a manner which facilitates uniformity and conformity as well as one that is capable of being easily monitored. These types of articulated concerns are largely subjective in nature, and directly reflect departmental policy. Therefore, they are not subject to mandatory negotiation. *See, e.g., Univ. Educ. Ass'n v. Regents*, 353 N.W.2d at 541. PELRA requires negotiation only if implementation is separable from establishment, and then only to the extent the policy directly affects a term and condition of employment, such as, for example, reimbursement for uniforms. *See Law Enforcement Labor Servs., Inc. v. City of Roseville*, 393 N.W.2d 670, 673 (Minn.App. 1986); *St. Paul Fire Fighters Local 21 v. City of St. Paul*, 336 N.W.2d 301, 302 (Minn.1983).

We likewise disagree with respondent's contention that the largely subjective aim of the department to project such a public image through a grooming policy would

---

4. Although not directly in point, cases which have arisen under the National Labor Relations Act have, in a private industrial context, held that physical appearance standards must be negotiated. *See The Woods Schools*, 270 N.L.R.B. Dec. (CCH) 171, 175 (1984); *Concord Docu-Prep, Inc.*, 207 N.L.R.B. Dec. (CCH) 981, 987–88 (1973). Courts of other jurisdictions having statutes which are similar, but yet different in significant respects, seemingly likewise have held physical appearance rules are negotiable. *See, e.g., School Dist. of Seward Educ. Ass'n v. School Dist. of Seward*, 188 Neb. 772, 784, 199 N.W.2d 752, 759 (1972) (citing with apparent

approval a Kansas statute which defines wearing apparel as a condition of employment).

5. Art. XXXIV, Section 2 of the collective bargaining agreement reads "discipline, when administered, will be in one or more of the following forms and normally in the following order: A. Oral Reprimand, B. Written Reprimand, C. Suspension, D. Discharge or Disciplinary Demotion." That disciplinary process was used in the cases of the three deputies who failed to comply after the modified policy was established in May of 1988.

not be hampered by mandatory negotiation. Although mandatory bargaining normally provides a reasonable resolution of most labor management disputes, as demonstrated by PELRA and our cases, nonetheless, narrowly defined exceptions do exist. In our opinion, this is one of those exceptions. The practicalities of labor-management negotiation almost inevitably require give and take by both parties. Each issue, as part of the overall bargaining, often may become, in effect, a chip on the bargaining table subject to trade or modification. Hypothetically, an elected sheriff, in order to obtain economic or budgetary concessions, might be compelled to trade or modify a noneconomic issue, such as a personnel grooming policy. Were we to hold that bargaining on implementation of this type of grooming policy is required, it might very well frustrate the efforts of the sheriff, an official responsible to the public which has elected him, to implement a personnel grooming policy which the sheriff deems appropriate to inspire the confidence and the trust of that public in its law enforcement department.[6] Therefore, we conclude the grooming policy's implementation is so intertwined with its establishment as to be effectively inseparable. Although the precise issue was not there involved, by its holding in *Stradley v. Andersen*, 478 F.2d 188, 190 (8th Cir.1973), the 8th U.S. Circuit Court of Appeals demonstrates that a decision respecting grooming policy for law enforcement employees involves managerial discretion.

It cannot be gainsaid that the sheriff's execution of the statutory law enforcement duties entrusted to him is greatly facilitated if the department he or she heads enjoys the respect and confidence of the public it serves. As the responsible elected authority in that department, as a part of his management efforts, it is up to the sheriff to formulate and implement personnel grooming policies for department employ-

ees which, in his judgment, will enhance public respect and contribute to public confidence in the department. It seems to us that an integral part of that managerial decision is the ability to place it in operation, or, in other words, to implement it. Thus, even though the grooming policy does have some impact upon the "terms and condition of employment" of departmental workers, we conclude, in light of the particular perceived need that department employees, when dealing with the public, project positive images, that this particular personnel grooming policy, either in its establishment or implementation is not subject to mandatory bargaining under PELRA.

Reversed and remanded.

---

**6.** We note that the record shows that in order to be accredited by the Commission on Accreditation of Law Enforcement Agencies, a law enforcement agency must meet all of several hundred different standards. One of those standards involves a personal grooming policy for department personnel. The Hennepin County Sheriff Department, at the time of the trial, was apparently attempting to seek such accreditation. However, the record is silent respecting precisely what personal grooming standards are acceptable to meet that accreditation requirement.