LOCAL NO. 1119, AMERICAN FEDERATION STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL–CIO, for itself and on behalf of Basic Unit Employees of the Mesabi Regional Medical Center, Appellant,

v.

MESABI REGIONAL MEDICAL CENTER, Respondent.

LOCAL #791, AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, AFL–CIO, for itself and on behalf of Basic Unit Employees of the City of Hibbing, Appellant,

v.

CITY OF HIBBING, Respondent.

No. C5–90–853.

Court of Appeals of Minnesota.

Nov. 20, 1990.

Don L. Bye, Eric D. Hylden, Halverson, Watters, Bye, Downs, Reyelts & Bateman, Ltd., Duluth, for Local # 1119 and Local # 791.

David Naughtin, Naughtin, Mulvahill & Minton, Ltd., Hibbing, for Mesabi Regional Medical Center and City of Hibbing.

Considered and decided by CRIPPEN, P.J., and FOLEY and SCHUMACHER, JJ.

## OPINION

SCHUMACHER, Judge.

Local Union # 1119, Minnesota Council # 65 of the American Federation of State, County and Municipal Employees, AFL–CIO (Local 1119) and Local Union # 791, American Federation of State, County and Municipal Employees, AFL–CIO (Local 791) appeal from the trial court's denial of their joint motions to compel the Mesabi Regional Medical Center (Medical Center) and the City of Hibbing, respectively, to enter into arbitration pursuant to the terms of their collective bargaining agreements. The motions to compel arbitration were brought pursuant to Minn.Stat. § 572.09(a) (1988). The trial court ruled that under the language of each of the collective bargaining agreements, the disputes of the respective unions fell within the exclusive management rights of the Medical Center and the City of Hibbing, and hence, were not subject to arbitration. We disagree.

### FACTS

Local 1119 is the exclusive bargaining representative for unit employees of the Medical Center. Local 791 is the exclusive bargaining representative for unit employees of the City of Hibbing. Both Local 1119 and Local 791 moved the trial court to compel arbitration of grievances pursuant to Minn.Stat. § 572.09(a) (1988) after both the Medical Center and Hibbing refused to enter into arbitration. These motions were heard jointly before the trial court because of the similarity of the issues involved. Both motions were denied.

### 1. Medical Center Grievance

In July 1989, Local 1119 filed a class action grievance regarding the way in which the Medical Center was assigning unit full-time and part-time positions and using casual employees to do unit work in its treatment center. Specifically, the union grieved the Medical Center's practice of breaking up full-time positions and converting them to part-time and utilizing casual employees in avoidance of the collective bargaining agreement provisions relating to those respective status levels. Local 1119 based the grievance on the following provisions of the collective bargaining agreement:

### ARTICLE I

*RECOGNITION AND MEMBERSHIP*

*I. (A)*

*The Employer recognizes the Union as the exclusive bargaining representative with respect to wages, hours of work, and other conditions of employment for the employees working in the bargaining unit, as follows:*

*Full-time and part-time non-professional employees, excluding all confidential office employees, accredited technicians, supervisors, and all professional employees.*

\*       \*       \*       \*       \*       \*

### ARTICLE XIV.

*SENIORITY, JOB PROTECTION AND DISCIPLINE*

\*       \*       \*       \*       \*       \*

*XIV (B)*
*Job Protection:*
1. *Layoff:*
(a) Seniority shall govern in layoff and rehiring, providing qualifications are equal. Employees laid off due to lack of work shall be given priority according to seniority. The last employee hired shall be the first employee laid off, and the last employee laid off shall be the first employee re-hired. The Employer, in order to maintain the best operating efficiency, shall reserve the right to temporarily transfer employees from unit to unit within a department.

\*       \*       \*       \*       \*       \*

2. *Temporary (Short–Term) Staffing Adjustments (Transfer and/or Excused Days[ ) ]:*

\* \* \* \* \* \*

(b) When census fluctuations require temporary staff reductions on a daily basis, the following procedure shall be followed:

1. *The Hospital shall not use casual employees unless shifts have first been offered to and rejected by regularly scheduled staff through established Hospital procedure.*

\* \* \* \* \* \*

3. *Permanent Transfer:*

(a) Notices of the vacancies and the qualifying details of bargaining unit positions shall be posted for a minimum of ten (10) days. The senior employee making application shall be transferred to fill the vacancy or new position, provided he has the necessary qualifications to perform the job involved. The Hospital shall make the determination as to whether or not an applicant possesses the necessary qualifications. In the event the Union does not concur in the determination, the applicant shall have the right of appeal through the normal grievance procedure. Until such vacancy is permanently filled, the Hospital may assign any employee to temporarily fill such vacancy.

(Emphasis added.)

The Medical Center responded to the union's grievance by denying it was breaking up full-time positions and converting them into part-time or casual positions. Further, the Medical Center stated it had no obligation to bargain or negotiate with the union regarding the number of employees hired or utilized. The Medical Center based this argument on Article II of the collective bargaining agreement which governs management rights and provides:

*Except as specifically limited by this Agreement, the management of the Hospital and the direction of working forces shall be vested solely and exclusively in the Hospital. This provision shall include, but is not limited to, the right to hire; to determine the quality and quantity of work performed; to lay off employees; to assign and delegate work; to enter into contracts for the furnishing and purchasing of supplies; to maintain and improve efficiency; to require observation of Hospital rules, regulations, retirement and other policies; to discipline or discharge employees for cause; to schedule work and determine the number of hours to be worked; to determine the methods and equipment to be utilized and the type of service to be provided; and to change or discontinue existing methods of service and equipment to be used or provided.* (Emphasis added.)

The collective bargaining agreement between the unit workers and the Medical Center contains an arbitration clause. This clause in Article XI(b) provides: "Should differences arise between the Hospital and the Union as to the interpretation of or adherence to the terms and provisions set forth herein, or should a grievance arise, \* \* \* either the Hospital or the Union may refer the matter to arbitration."

## *2. City of Hibbing Grievance*

In July and August of 1989, Local 791 filed five class action grievances regarding the hiring of non-union temporary truck drivers by the City of Hibbing and also regarding the refusal of the city to let equipment operator unit employees bump these temporary employees from the truck driving positions. The city voluntarily agreed to arbitrate three of the grievances, but not the other two. The two remaining grievances concerned the effect of, and conflict with, the hiring of the temporary employees on the terms of the collective bargaining agreement covering rate of pay, hours of work, job classification and seniority. Local 791 based the grievances on the following provisions of the collective bargaining agreement:

### ARTICLE I

### *RECOGNITION*

*City of Hibbing, Minnesota, hereby recognizes Local 791, American Federa-*

tion of State, County and Municipal Employees, AFL–CIO, as the exclusive representative for collective bargaining purposes of all regular, full-time and part-time employees as they are defined and set forth in the Public Employment Labor Relations Act for the State of Minnesota, hereinafter referred to as PELRA. Excluded from such unit are elected officials, employees of the Fire and Police Departments, City Attorney, Commissioner of Registration, City Engineer, supervisory employees, confidential employees, Assessor, Building Inspector, Plumbing Inspector and City Planner.

\*   \*   \*   \*   \*   \*

## ARTICLE IX

### SENIORITY

\*   \*   \*   \*   \*   \*

*Section 5.*

Notice of all vacancies and newly created positions shall be posted on the employees' bulletin board, and the employees shall be given seven (7) days time in which to make an application to fill said vacancy or new position. The senior employee making application shall be transferred to fill a vacancy or new position, provided he has the necessary qualifications to perform the duties of the job involved.

\*   \*   \*   \*   \*   \*

*Section 6.*

*Temporary vacancies shall be governed by the following rules. If the vacancy lasts less then one (1) day, any available employee may be assigned to fill the job. If the vacancy lasts a day or more, the senior qualified employee opting to fill the position shall fill the position.* A "day" is defined to mean the 24–hour period commencing at 7:00 a.m. Should the vacancy be expected to last thirty (30) days or more, then the posting provisions of the contract will be followed in filling the vacancy. An employee filling a temporary vacancy under this clause shall have the right to return to his previous position when the temporary vacancy is over.

(Emphasis added.)

The City of Hibbing responded to the union's grievance by denying it had violated the terms of the collective bargaining agreement by hiring the temporary employees. The city argued that besides having posted the truck driving positions as required, the hiring of the temporary employees concerned an inherent managerial policy not subject to arbitration as provided in Article II of the collective bargaining agreement. Article II provides:

> A public employer is not required to meet and negotiate on matters of inherent managerial policy. *Matters of inherent managerial police [sic] include, but are not limited to, such areas of discretion or policy as the* functions and programs of the employer, its overall budget, utilization of technology, the organizational structure, *selection of personnel, and direction and number of personnel.*

(Emphasis added.) The exclusive management rights provision of the Public Employment Labor Relations Act (PELRA), which also governs the agreement between the union and the city, is substantially similar to Article II. *See* Minn.Stat. § 179A.07, subd. 1 (1988).

The collective bargaining agreement between the unit workers and the city provides for a detailed grievance procedure, including the right to arbitration. Specifically, Article XI of the agreement provides:

> The employee and the Union will attempt to adjust *all* grievances which may arise by virtue of this Agreement[.] \* \* \* In the event no settlement is reached \* \* \*, the grievance shall be submitted to arbitration \* \* \*. (Emphasis added.)

## ISSUE

Did the trial court err in refusing to compel arbitration of the grievances which the court found encompassed issues beyond the terms of the arbitration clauses found in the collective bargaining agreements?

## ANALYSIS

■ In reviewing an order to compel or stay arbitration, "[a] reviewing court is not bound by the trial court's interpretation of the arbitration agreement and independently determines whether the trial court correctly interpreted the clause." *Michael–Curry Cos. v. Knutson Shareholders Liquidating Trust*, 449 N.W.2d 139, 141 (Minn.1989); *see also Packer River Terminal, Inc. v. City of Minneapolis*, 445 N.W.2d 269, 270 (Minn.App.1989), *pet. for rev. denied* (Minn. Nov. 15, 1989).

The Minnesota Supreme Court has stated that the Uniform Arbitration Act "governs the authority and procedure for judicial interference with the arbitration process under either a private sector or public sector collective bargaining agreement containing an arbitration clause * * *." *State v. Berthiaume*, 259 N.W.2d 904, 909 (Minn. 1977). The Uniform Arbitration Act generally provides:

A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable, and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.

Minn.Stat. § 572.08 (1988). When a party subject to an arbitration agreement refuses to arbitrate, the Act further provides:

On application of a party showing an agreement described in section 572.08, and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration, but if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied.

Minn.Stat. § 572.09(a) (1988).

The Minnesota Supreme Court has stated on numerous occasions "that the issue of arbitrability, when raised in judicial proceedings to compel or stay arbitrability, is to be determined by ascertaining the intention of the parties from the language of the arbitration agreement itself." *E.g., Berthiaume*, 259 N.W.2d at 909. In order to assist courts in making this determination, the supreme court has set forth the following guidelines:

(1) If the parties evinced a clear intent to arbitrate a controversy arising out of specific provisions of the contract, the matter is for the arbitrators to determine and not the court. (2) If the intention of the parties is reasonably debatable as to the scope of the arbitration clause, the issue of arbitrability is to be initially determined by the arbitrators subject to the rights of either party reserved under Minn.St. 572.19, subd. 1(3, 5). (3) If no agreement to arbitrate exists, either in fact or because the controversy sought to be arbitrated is not within the scope of the arbitration clause of the contract, the court may interfere and protect a party from being compelled to arbitration (§ 572.09[a, b]).

*Atcas v. Credit Clearing Corp.*, 292 Minn. 334, 341, 197 N.W.2d 448, 452 (1972).

In this case, the trial court set forth the *Atcas* guidelines in the memorandum accompanying its order, but the court also seemed to rely on *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), in determining the arbitrability of the grievances. In *AT & T*, the United States Supreme Court stated that "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Id.* at 649, 106 S.Ct. at 1418. While this decision is clearly at odds with *Atcas,* the trial court did not reconcile or address this conflict. *Atcas* and *AT & T* are irreconcilable because *Atcas* holds that the issue of arbitrability is to be determined by the arbitrator when the intention of the parties from the arbitration agreement is either clear or "reasonably debatable," but *AT & T* provides that the issue of arbitrability is *almost always* to be determined by the court.

■ In support of the trial court's order denying arbitration, the Medical Center and the City of Hibbing argue on appeal that

*AT & T*, and not *Atcas*, must be followed in determining who determines the issue of arbitrability. This argument is incorrect. *AT & T* involves an interpretation of the Labor Management Relations Act, 1947, 29 U.S.C.A. §§ 141–87 (West 1973, 1978 & Supp.1990), whereas *Atcas* involves an interpretation of the Uniform Arbitration Act as adopted in Minnesota. Since the Court in *AT & T* was only interpreting a federal statute, courts in Minnesota are not bound by this interpretation when construing the Uniform Arbitration Act.

### A. Determining Arbitrability of the Medical Center Grievance

■ Applying the *Atcas* guidelines to the dispute between Local 1119 and the Medical Center, and also relying on the Article II management rights provision, the trial court found that "[t]he language of the Collective Bargaining Agreement clearly precludes from arbitration or negotiation the matter of the number of full or part time positions created by the Medical Center." This conclusion is unfounded in light of the grievance filed by Local 1119 and the broad scope of the arbitration clause contained in the collective bargaining agreement.

In this case, the union grieves that the Medical Center's practice of breaking up full-time positions and converting them to part-time, as well as utilizing casual employees, violates the terms of the collective bargaining agreement. The Medical Center denies breaking up the full-time positions and also argues it is not obligated to negotiate with the union regarding the number of employees hired or utilized because of its management rights under Article II. These conflicting contentions, however, are a good indication that, at least for the purpose of determining arbitrability, the language of the collective bargaining agreement does not clearly express the intention of the parties. As the Minnesota Supreme Court has aptly stated, "conflicting contentions demonstrate most forcibly that the language of the contract does not clearly express the intention of the parties." *Layne–Minnesota Co. v. Regents of the Univ. of Minn.*, 266 Minn. 284, 289, 123

N.W.2d 371, 375 (1963); *see also Packer River Terminal*, 445 N.W.2d at 270 (parties required to submit the issue of arbitrability to an arbitrator when in disagreement about the coverage of the arbitration clause). Since the union and Medical Center disagree about the scope of the arbitration clause and whether the grievance is subject to arbitration under it, the intention of the parties to arbitrate the dispute is at least reasonably debatable. As a result, under *Atcas* the issue of arbitrability must be determined by the arbitrator and not by the court as was done here. The trial court erred in denying Local 1119's motion to compel arbitration.

### B. Determining Arbitrability of the City of Hibbing Grievance

Applying the *Atcas* guidelines to the dispute between Local 791 and the City of Hibbing, the trial court found the hiring of the temporary truck drivers and the refusal of the city to let equipment operator unit employees bump the temporary employees from the truck driving positions did not violate the provisions of the collective bargaining agreement. The court specifically found that the hiring of the temporary employees was within the exclusive management rights provision of both Article II and Minn.Stat. § 179A.07, subd. 1 (1988), and therefore, clearly not subject to arbitration. This conclusion is erroneous for several reasons.

■ To begin with, the conclusion of the trial court is based on factual findings. A trial court, however, is not allowed to make factual findings when a motion to compel arbitration is brought before it. "In judicial proceedings to stay or compel arbitration, the limited issue presented is the existence and scope of the arbitration agreement." *United States Fidelity & Guar. Co. v. Fruchtman*, 263 N.W.2d 66, 71 (Minn.1978). The "court is barred from examining into the merits of * * * [any] defense." *Layne–Minnesota Co.*, 266 Minn. at 292, 123 N.W.2d at 377. In addition, Minn.Stat. § 572.09(e) (1988) specifically provides that "[a]n order for arbitra-

tion shall not be refused on the ground that the claim in issue lacks merit or bona fides or because any fault or grounds for the claim sought to be arbitrated have not been shown."

■ In this case, the trial court made and relied on numerous factual findings going to the merits in determining that the union's grievances were not subject to arbitration. The findings of the court included: (1) the temporary employees were not "public employees" as defined in Minn.Stat. § 179A.03, subd. 14 (1988); (2) both unit and temporary employees were needed to do work for the city; (3) the temporary truck drivers were not qualified to operate other city equipment so unit employees were needed to do so; and (4) the city did post the temporary jobs as required by the collective bargaining agreement. Based on these findings regarding the hiring of the temporary employees, the trial court found the union's grievances fell within the exclusive management rights of the City of Hibbing and hence, were not subject to arbitration. Regardless of how compelling these findings and the conclusion appear to be, however, the trial court is clearly not allowed to determine the issue of arbitrability in this manner.

■ Instead, the trial court should have determined the arbitrability of the grievance between the union and the city in a manner similar to the way done in *Law Enforcement Labor Servs., Inc. v. County of Hennepin*, 449 N.W.2d 725 (Minn.1990). In *Law Enforcement*, as in this case, a grievance was filed against a public employer concerning the terms and conditions of employment which the employer claimed involved matters of inherent managerial policy not subject to arbitration. The supreme court proceeded to analyze the dispute as follows:

> PELRA imposes upon a public employer "an obligation to meet and negotiate in good faith * * * regarding grievance procedures and the terms and conditions of employment * * *." Minn.Stat. § 179A.07, subd. 2 (1988). PELRA defines "terms and conditions of employment" as hours, benefits and "the em-

ployer's personnel policies affecting the working conditions of the employee." Minn.Stat. § 179A.03, subd. 19 (1988). In order to implement PELRA's underlying public policy of promoting orderly and constructive relationships between all public employers and their employees (Minn.Stat. § 179A.01 (1988)), the courts of this state have traditionally construed the statutory mandate broadly. *See, e.g., Univ. Educ. Ass'n v. Regents of the Univ. of Minnesota*, 353 N.W.2d 534, 538 (Minn.1984). Yet, as we continued to iterate that construction rule, we simultaneously recognized that it may be limited if the matter in dispute involves an inherent managerial policy. Moreover, we have acknowledged that there are close cases in which "inherent managerial policy" overlaps upon the "terms and conditions of employment" requiring the use of a discreet analysis, which may involve a weighing of conflicting policy considerations. *See e.g., Univ. Educ. Ass'n v. Regents*, 353 N.W.2d at 539.

> \* \* \* \* \* \*

> *\* \* \* Thus, to decide whether negotiation is required, the court must first determine whether the public employer's management decision has an impact on "terms and conditions of employment." If it does, the court must then further ascertain whether the establishment of the policy is distinct and separable from its implementation. If the two are not so distinct and separate, negotiation is not required.* Univ. Educ. Ass'n v. Regents, 353 N.W.2d at 539.

*Id.* at 727–28 (footnote omitted) (emphasis added).

In this case, the hiring of the temporary employees probably affects the working conditions of the unit employees. If, as alleged by Local 791, the city did not post the temporary truck driving positions, or the city refused to let equipment operator unit employees bump the non-union temporary employees from the truck driving positions, the city violated Article IX of the collective bargaining agreement. Therefore, following the analysis described in

*Law Enforcement*, implementation of the decision to hire the temporary truck drivers is required to be negotiated unless its establishment is inseparable from its implementation. Applying that test here, while the city has the inherent managerial right to select and determine, i.e., establish, the number of personnel it needs, the use of those employees, i.e., implementation, is subject to the terms of the collective bargaining agreement. Hence, implementation of the decision to hire the temporary employees must be negotiated with the union. Further, the Minnesota Supreme Court has stated that when work assigned to non-unit employees "is included within the work assigned to members of the bargaining unit," such assignments "are subjects of mandatory negotiation." *Foley Educ. Ass'n v. Independent School Dist. No. 51*, 353 N.W.2d 917, 924 (Minn.1984). As a result, since truck driving is included within the work assigned to members of the equipment operators unit, the use of temporary employees to drive trucks is subject to mandatory negotiation. The trial court erred in denying the union's motion to compel arbitration.

### DECISION

The trial court erred in denying Local 1119's and Local 791's joint motions to compel arbitration.

Reversed and remanded.