LAW ENFORCEMENT LABOR
SERVICES, INC., Local No.
158, et al., Appellants,

v.

SHERBURNE COUNTY,
et al., Respondents.

No. A04–1474.

Court of Appeals of Minnesota.

May 3, 2005.

Marylee Abrams, Tiffany L. Schmidt, Law Enforcement Labor Services, Inc., St. Paul, MN, for appellants.

Scott M. Lepak, Barna, Guzy & Steffen, Ltd., Coon Rapids, MN, for respondents.

Considered and decided by WILLIS, Presiding Judge; STONEBURNER, Judge; and PORITSKY, Judge.

## OPINION

PORITSKY *, Judge.

This appeal is from a summary judgment dismissing appellant-labor union's claims seeking relief from a county-employer's unilateral implementation of a random drug-testing policy, established by the county in accordance with Minn.Stat. § 181.951, subd. 4 (2004). We conclude that the establishment of a random drug-testing policy as expressly authorized by statute, including the designation of which employees are in the "safety-sensitive" positions, is not subject to collective bargaining even though it affects the terms and conditions of employment. But aspects of the implementation of the policy that are not inextricably intertwined with its establishment are mandatory subjects for collective bargaining. Thus, when the county unilaterally imposed terms and conditions of employment under such a policy without providing an opportunity to bargain the terms of its implementation, the county committed an unfair labor practice. Appellants did not waive their right to pursue an unfair-labor-practice claim when they refused the county's offer to "meet and confer" on the policy. Finally, we conclude that the establishment of a random drug-testing policy for employees in safety-sensitive positions does not violate the employees' Fourth Amendment rights. We therefore (1) affirm the district court's determination that the establishment of the policy does not constitute an unfair labor practice, (2) affirm the court's denial of the Fourth Amendment claim, but (3) reverse the district court's determination that the parties had no obligation to meet and negotiate those aspects of the policy's implementation that are severable from its establishment, and remand with directions that the district court allow the union to pursue its unfair-labor-practice claim, insofar as the claim relates to bargainable terms of the policy's implementation.

## FACTS

As exclusive representative, the appellant labor union[1] is responsible for contract negotiations, grievance representation, and internal-affairs representation for its members. In September 2003, Sherburne County's human resources director sent a memorandum to the union proposing to amend the county's existing alcohol and drug use policy to include random drug testing of employees in safety-sensitive positions in accordance with the Minnesota Drug and Alcohol Testing in the Workplace Act (Workplace Testing

---

\* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. Appellants are Law Enforcement Labor, Services, Inc., (LELS) a labor union representing law enforcement personnel throughout Minnesota, and its Locals No. 158 and 158.12, which represent patrol deputies, investigators, transport/security deputies, and 911 dispatchers employed by Sherburne County. All three appellants will be collectively referred to as "the union."

Act). The memorandum stated that the county was willing to meet and confer on the proposed amendments. The union replied with its position that the proposed amendments constituted terms and conditions of employment under the Minnesota Public Employment Labor Relations Act (PELRA), so that the county was required to meet and negotiate over the proposed amendments prior to implementation. At about the same time, the county met and conferred with another bargaining unit, which had no objection to the proposed policy changes. The county then adopted the amendments in October 2003.

In January 2004, the union reiterated its opposition to the amendments and, in February 2004, submitted a grievance under its labor agreement with the county, alleging failure to meet and negotiate over terms and conditions of employment. Just prior to filing the grievance the union learned that the county had tested three employees in accordance with the amended policy.

LELS and Local No. 158, the local representing patrol deputies, investigators, and transport/security deputies, filed a complaint in district court, seeking injunctive relief restraining the county from unilaterally implementing the policy, damages, and an order requiring the county to meet and negotiate over the terms of the drug-testing policy. The district court denied the union's application for a temporary restraining order. After both parties moved for summary judgment, the district court granted the union's motion to amend the complaint to allege a violation of Fourth Amendment rights and to add Local 158.12, representing 911 dispatchers, as a plaintiff.

The district court rendered summary judgment for the county, denying all of the union's claims. The court determined that although the amended testing policy had

an impact on the terms and conditions of employment, the policy was inseparable from its implementation under the Workplace Testing Act. Further, the court ruled that the requirement of Minn.Stat. § 181.955, subd. 1 (2004), that bargaining be permitted over a drug-testing policy that "meets or exceeds" the minimum statutory requirements, did not apply when the policy did not differ meaningfully from the statute. The union has appealed, arguing that (1) the district court erred as a matter of law in concluding that the establishment and implementation of the policy did not require collective bargaining under PELRA; (2) the imposition of the policy constituted an unfair labor practice under the parties' collective-bargaining agreement, which the union did not waive; and (3) the application of the policy to its members violated the Fourth Amendment.

## ISSUES

I. Did the district court err in concluding as a matter of law that both the establishment and implementation of the county's random drug-testing policy were not subjects for mandatory collective bargaining?

II. Did the county's unilateral imposition of the random drug-testing policy constitute an unfair labor practice, and if so, did the union waive its right to pursue an unfair-labor-practice claim when it did not accept the county's offer to meet and confer?

III. Did the implementation of the random testing policy violate the Fourth Amendment rights of affected employees?

## ANALYSIS

### I

The district court granted summary judgment for the county on the basis that the county's random drug-testing policy,

established and implemented under the Workplace Testing Act, did not require collective bargaining with the union. When a district court grants summary judgment based on the application of a statute to undisputed facts, the result is a legal conclusion that is reviewed de novo. *Lefto v. Hoggsbreath Enters., Inc.*, 581 N.W.2d 855, 856 (Minn.1998). Statutory construction is similarly a question of law, reviewable on a de novo basis. *Wiegel v. City of St. Paul*, 639 N.W.2d 378, 381 (Minn.2002).

In examining the application of a statute, we look first to its language to ascertain and effectuate legislative intent. Minn.Stat. § 645.16 (2004) (setting forth plain meaning rule); *Kersten v. Minn. Mut. Life Ins. Co.*, 608 N.W.2d 869, 874–75 (Minn.2000). If the meaning of a statute is plain, judicial construction is neither necessary nor proper. *Occhino v. Grover*, 640 N.W.2d 357, 359 (Minn.App.2002), *review denied* (Minn. May 28, 2002). Plain meaning embodies ordinary use of language in the context of the whole-act structure, applying the usual conventions of syntax and grammar. *Id.* Statutory interpretation should, if possible, give effect to all the provisions of a statute, and " 'no word, phrase, or sentence should be deemed superfluous, void, or insignificant.' " *Baker v. Ploetz*, 616 N.W.2d 263, 269 (Minn.2000) (quoting *Amaral v. Saint Cloud Hosp.*, 598 N.W.2d 379, 384 (Minn.1999)). In addition, courts must presume that the legislature intends to give effect to all the provisions of a statute, Minn.Stat. § 645.17(2) (2004), and must construe every law, if possible, in order to give effect to all its provisions. Minn.Stat. § 645.16.

When employers—either public or private—seek to require employees to undergo drug testing, the matter is governed by the Workplace Testing Act, Minn.Stat. §§ 181.950–.957 (2004). Section 181.951 generally authorizes employers to "request or require" employees to undergo such testing, but, at the same time, imposes limits on that authority. Subdivision 4 of section 181.951 specifically provides that "[a]n employer may request or require only employees in safety-sensitive positions to undergo drug and alcohol testing on a random selection basis." The Workplace Testing Act defines "safety-sensitive positions" as positions "in which an impairment caused by drug or alcohol usage would threaten the health or safety of any person." Minn.Stat. § 181.950, subd. 13.

The Workplace Testing Act, Minn.Stat. § 181.955, subd. 1, also permits collective bargaining on drug-testing policies that "meet or exceed" the act's requirements. That subsection provides:

> Sections 181.950 to 181.954 shall not be construed to limit the parties to a collective bargaining agreement from bargaining and agreeing with respect to a drug and alcohol testing policy that *meets or exceeds*, and does not otherwise conflict with, the minimum standards and requirements for employee protection provided in those sections.

*Id.* (emphasis added).

Because the county is a public employer, we consider the application of the Workplace Testing Act in this case under the requirements for collective bargaining imposed by PELRA. Under PELRA, public employers are not required to negotiate over "matters of inherent managerial policy." Minn.Stat. § 179A.07, subd. 1 (2004). Such matters include discretionary or policy matters such as an employer's functions or programs, budget, technology use, organizational structure, and the selection, direction and numbers of personnel. *Id.* But PELRA imposes on a public employer the "obligation to meet and negotiate in good faith ... regarding grievance procedures and the terms and conditions of

employment." Minn.Stat. § 179A.07, subd. 2 (2004). Terms and conditions of employment are defined under PELRA as hours, compensation, certain benefits, and "personnel policies affecting the working conditions of the employees." Minn.Stat. § 179A.03, subd. 19 (2004).

The Minnesota Supreme Court has recognized that in some close cases, "inherent managerial policy" overlaps with "terms and conditions of employment." *Law Enforcement Labor Servs., Inc. v. County of Hennepin,* 449 N.W.2d 725, 727 (Minn.1990) (quotation omitted). In these cases, "[i]f the policy decision ... is so intrinsically interwoven with its implementation that to require the public employer to negotiate its implementation would also force it to negotiate the underlying policy decision, no negotiation is required." *Id.* In cases where there is such an overlap, a two-step process is required: first, the court must determine whether the policy has an impact on "terms and conditions of employment," and second, if it does, the court must ascertain whether the policy's establishment is separate and distinct from its implementation. *Id.* at 728.

If the establishment and the implementation are not separate and distinct, implementation is not subject to mandatory bargaining. *See id.* at 729 (concluding that because establishment of grooming policy for sheriff's department personnel was inseparable from implementation of policy, mandatory bargaining was not required). But if establishment and implementation are separate and distinct, implementation is subject to bargaining. In *City of West St. Paul v. Law Enforcement Labor Servs., Inc.,* 481 N.W.2d 31, (Minn. 1992), the city had a police ride-along program. One part of the program was for people training to become licensed police officers, and the court ruled that this part of the program was "inextricably en-

twined" with the establishment of the program and thus not subject to mandatory bargaining. *Id.* at 35. But as to another part of the program, which was for Explorer Scouts and other community volunteers, the implementation was sufficiently severable from the decision to establish the program such that implementation was subject to mandatory bargaining. *Id.; see also Law Enforcement Labor Servs., Inc. v. City of Luverne,* 463 N.W.2d 546, 549–50 (Minn.App.1990) (implementation of certain aspects of physical examination policy for police officers was not so inextricably intertwined with policy itself so as to render those aspects nonnegotiable), *review denied* (Minn. Feb. 20, 1991).

Accordingly, we first determine whether the county's establishment of the random drug-testing policy is subject to negotiation. In *City of West St. Paul* the supreme court had "no difficulty, ... in concluding that the decision to establish a particular ride-along program is generally a discretionary policy decision not subject to mandatory bargaining." 481 N.W.2d at 34. Here, the county's policy for random drug testing furthers the county's function of providing for the public safety at least to the same degree as did that part of West St. Paul's ride-along program for persons training to become licensed police officers, and certainly more than did that part of the West St. Paul's program for Explorer Scouts. *See also City of Luverne,* 463 N.W.2d at 548 (police officer's union agreed that establishment of physical examination policy applicable to all full-time employees was a matter of inherent managerial right, even though union challenged policy's implementation.)

As we have noted, the Workplace Testing Act authorizes an employer to "request or require" drug and alcohol testing, Minn. Stat. § 181.951, subd. 1, and further authorizes the employer, subject to certain

limits, to "request or require" random drug testing. *Id.* subd. 4. If the language authorizing testing has any meaning, in our view it must at least refer to an employer's right to establish a random drug-testing policy, or else it has no meaning.

In a similar vein, we note that the union, while arguing that the employees have a right to collectively bargain over any random drug testing, does acknowledge that the Workplace Testing Act protects "an employers' [sic] right to choose whether to test." Here, too, we conclude that if the county has any right to choose whether to test, that right must include the right to establish a random drug-testing program, or else the county has no right whatsoever under section 181.951, subdivision 4.

Consequently, we conclude that the district court did not err in its implicit ruling that the county's decision to establish a random drug-testing policy is an inherent managerial right. This conclusion leads to the next step in the analysis: Does the decision have an impact on the terms and conditions of employment? On this issue we agree with the district court's finding that, "[t]he random drug testing policy has an impact on the union members' terms and conditions of employment, because members would be subject to a change of duties, discipline, and possible dismissal." [2]

The final step in this analysis is to determine whether the establishment of the policy under Minn.Stat. § 181.951, subd. 4 is inseparable from the policy's implementation, so that neither the establishment nor the implementation of the policy is subject to collective bargaining. On this issue, we look first to that part of the policy designating certain categories of employees as "safety sensitive" and thus subject to testing. The Workplace Testing Act specifically authorizes testing of employees in "safety-sensitive positions," Minn.Stat. § 181.951, subd. 4, and defines those positions as those "in which an impairment caused by drug or alcohol usage would threaten the health or safety of any person." Minn.Stat. § 181.950, subd. 13. The county's policy identifies the following categories of employees as safety sensitive: jail personnel, patrol officers, investigators, the director of emergency management, and transport/court security deputies.[3] This provision sufficiently describes the scope of positions subject to testing, and there can be no serious question that all the positions on the county's list are those with duties that implicate the public safety and health. In our view, to require the county to bargain on the issue of which positions are safety sensitive would "likely hamper the establishment of the policy." *City of West St. Paul,* 481 N.W.2d at 34. We conclude, therefore, that designation of which positions are safety sensitive, and thus subject to the policy, is so interwoven with the establishment of the policy that to force the county to negotiate the issue of designation would be to force the county to negotiate the underlying policy. We further conclude although designating which positions are safety sensitive may be part of implementing the policy, the county is not required to negotiate on that issue.

We disagree, however, with the district court's conclusion that, as a matter of law, none of the aspects of the policy's imple-

---

2. The policy provides in part: "Violations of this policy will constitute just cause for discipline, up to and including discharge."

3. The policy specifically identifies the following safety-sensitive positions: "corrections officer, jail sergeant, jail captain, jail adminis-

trators, jail recreation/programming staff, master control operators, patrol deputies, patrol sergeants, patrol captain, investigators, investigative sergeant, director of emergency management, and transport/court security deputies."

mentation is severable from its establishment. The plain language of Minn.Stat. § 181.955, subd. 1, permits the parties to bargain concerning a policy that "meets or exceeds" the minimum standards for employee protection specified in the Workplace Testing Act. This is consistent with legislative policy that provisions of the Workplace Testing Act were intended to provide a level of minimum mandated protection for employees affected by random drug testing. *See* Barbara Jean D'Aquila, *Drug and Alcohol Testing in the Workplace: the Legislative Response*, 14 Wm. Mitchell L.Rev. 255, 270 (1988) ("In an organized labor setting, the [Workplace Testing] Act only establishes the statutorily-minimum protections that employers must provide to employees.").

Although it is not the province of the courts to suggest which areas are subject to collective bargaining,[4] we agree with the union that such areas exist. Therefore, we conclude that the district court erred in determining that the parties had no obligation to meet and negotiate concerning those areas of implementation of the county's random drug-testing policy.

## II

Since we have determined that the union has collective bargaining rights in some areas of policy implementation, we address whether the county engaged in an unfair labor practice by refusing to meet and negotiate concerning those areas. Under PELRA, an employer has engaged in an unfair labor practice if it "refus[ed] to meet and negotiate in good faith with the exclusive representative of its employees in an appropriate unit." Minn.Stat. § 179A.13, subd. 2(5) (2004). This requirement comports with the established labor law principle that a unilateral change by an employer in the terms and conditions of employment constitutes a prima facie violation of the employees' collective-bargaining rights. *Foley Educ. Ass'n v. Indep. Sch. Dist. No. 51*, 353 N.W.2d 917, 920–21 (Minn.1984) citing *NLRB v. Katz*, 369 U.S. 736, 742–43, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962).[5] In order to constitute an unfair labor practice, the unilateral change must affect a mandatory bargaining term and be inconsistent with past practices of the parties. *Id.* at 921. "The crucial inquiry in such event is whether the employer's unilateral action deprived the union of its right to negotiate a subject of mandatory bargaining." *Id.* This court has recently held that a unilateral freeze in wages and benefits, coupled with an employer's failure to respond to the employees' union's demand for bargaining, constituted a refusal to bargain, which was an unfair labor practice. *Educ. Minn.-Greenway, Local 1330 v. Indep. Sch. Dist. No. 316*, 673 N.W.2d 843, 851 (Minn.App.2004), *review denied* (Minn. Apr. 20, 2004).

The county argues that its amendment of the policy was consistent with past practice because a previous drug and alcohol testing policy was already in place, which operated outside of the collective bargaining process, and that the collective bargaining agreement gave the county broad authority to establish any term or condition of employment not specifically refer-

---

4. In *City of Luverne* this court said: "We decline to hold the parties to the ... areas ... as either negotiable or non-negotiable. Rather, the parties must be free to explore a variety of avenues in negotiating the implementation of the policy." 463 N.W.2d at 550 n. 3.

5. The Minnesota Supreme Court has recognized, in interpreting PELRA, that "it is often instructive to refer to decisions interpreting the National Labor Relations Act (NLRA), 29 U.S.C.A. §§ 151 to 168." *Int'l Union of Operating Eng'rs, Local No. 49 v. City of Minneapolis*, 305 Minn. 364, 368, 233 N.W.2d 748, 752 (1975).

enced in the agreement. But Minnesota courts have recognized that under the past-practices doctrine, "the industrial law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *Ramsey County v. AFSCME, Council 91, Local 8*, 309 N.W.2d 785, 791 (Minn.1981) (quoting *United Steelworkers of Am.v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960)). And the past drug-testing policy allowed testing only in for-cause situations: job applications, reasonable suspicion to test, or if an employee had participated in a prescribed chemical dependency program. The amended drug-testing policy provided an increased level of intrusiveness for affected employees and was therefore inconsistent with past practice. Further, the application of the PELRA analysis and Minn.Stat. § 181.955, subd. 1, which recognizes that certain areas of implementation of a drug-testing policy are subject to collective bargaining, supports the determination that a unilateral change occurred, affecting mandatory bargaining terms.

▄ The county further argues that the union waived its right to bargain concerning these terms when it failed to respond to the county's offer to "meet and confer" concerning the random-testing policy. Minnesota courts have recognized that "[i]n order to waive a statutory right to negotiate on a mandatory subject of bargaining, a union must express its intention to waive in 'clear and unmistakable language.'" *City of Luverne*, 463 N.W.2d at 550 quoting *Gen. Drivers Union Local 346 v. Indep. Sch. Dist. No. 704*, 283 N.W.2d 524, 527 (Minn.1979). The drug-testing policy was initially outlined in a memorandum that gave the union an opportunity to "meet and confer" about the proposed changes. But under PELRA, "meet and confer" has a substantially different meaning from "meet and negotiate." *Compare* Minn.Stat. § 179A.03, subd. 10 (2004) (defining "meet and confer" as "the exchange of views and concerns between employers and their employees"); *with* Minn.Stat. § 179A.03, subd. 11 (2004) (defining "meet and negotiate" as "the performance of the mutual obligations of public employers and the exclusive representatives of public employees to meet at reasonable times … with the good faith intent of entering into an agreement on terms and conditions of employment"). Thus, the county's offer to "meet and confer" did not constitute an offer to "meet and negotiate," and we conclude that the union did not waive its collective-bargaining rights by not agreeing to the county's offer. Therefore, we remand for the district court to make a determination on the union's request for injunctive relief and, if appropriate, to order damages.

## III

▄ The union also argues that the county's implementation of the random-testing policy for "safety-sensitive" employees, which is authorized by the Workplace Testing Act, violates the Fourth Amendment rights of the affected employees.[6] The district court granted the union's motion to add this cause of action to its complaint but granted summary judgment denying the claim without comment.

▄▄ The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. U.S. Const. amend. IV; *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 613–14, 109 S.Ct. 1402, 1411, 103 L.Ed.2d 639 (1989). In criminal cases, "[e]xcept in well-defined circumstances" a search is not

---

6. The union has made no claims under the Minnesota Constitution.

reasonable unless it is accomplished pursuant to a warrant issued upon probable cause. *Id.* at 619, 109 S.Ct. at 1414. But the Supreme Court has recognized limited exceptions to this rule in "when special needs, beyond the normal need for law enforcement make the warrant and probable-cause requirement impracticable." *Id.* (quotation omitted). In those situations, a court carefully balances an individual's need for privacy against the government's need to conduct the search. *Id.* Thus, the Supreme Court in *Skinner* upheld Federal Railway Administration's regulation requiring breath and urine tests of all employees involved in accidents and allowed for reasonable-suspicion testing after a violation of safety rules. *Id.* at 623–33, 109 S.Ct. at 1417–22. Moreover, the Court has upheld drug testing even when there was no individualized suspicion of wrongdoing on the part of the persons tested. *See Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 660–61, 677, 109 S.Ct. 1384, 1396–97, 103 L.Ed.2d 685 (1989) (as condition of placement or employment in positions directly involving the interdiction of illegal drugs or positions that require carrying firearms, customs agents could be required to undergo drug testing).

Following the reasoning in *Skinner,* the Minnesota federal district court has held that Metropolitan Council's random drug-testing policy for its wastewater treatment plant employees did not violate the Fourth Amendment. *Geffre v. Metro. Council,* 174 F.Supp.2d 962, 967–68 (D.Minn.2001). In *Geffre,* the court issued summary judgment for the employer, concluding in relevant part that as a matter of law, the drug testing was reasonable because the em-

ployees occupied safety-sensitive positions. *Id.* In analyzing the Fourth Amendment claim, the court concluded that the Metropolitan Council had a special need because there was a risk of serious personal injury and harm to public health and the environment. *Id.* Further, the plaintiffs had a diminished expectation of privacy, as did the railway workers in *Skinner,* because they worked in an industry that was heavily regulated to insure safety. *Id.* The court also noted that the testing procedure was designed to minimize the intrusion on employees' privacy. *Id.* at 968. Thus, on the Fourth Amendment claim, the court ruled that employees could be subject to random drug testing, even though there was no individualized reason for singling out the persons tested.

Here, the union argues that the application of the county's policy impermissibly bypasses the required fact-specific constitutional scrutiny of the balancing test by permitting the county to require random drug testing of employees in safety sensitive positions.[7] But, as in *Von Raab* and *Geffre,* here there is a risk of serious harm to the public, should the designated safety-sensitive employees be working under the influence of alcohol or drugs. The public employees involved in the present case also have a diminished expectation of privacy through their work in safety-sensitive positions with the county. And the county's policy specifically references the Workplace Testing Act, which provides reliability and fairness safeguards for testing, including standards for laboratories used, the employee's right to explain a positive test, the right to obtain a confir-

---

**7.** The union also argues on appeal that the county impermissibly equated the category of "safety-sensitive" employees with the broader designation of "essential employees" who are not permitted to strike. *See* Minn.Stat. § 179A.03, subd. 7 (2004) (defining "essential

employees"). But the district court did not rule on this issue, and we decline to consider it on appeal. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988) (reviewing court must generally consider only issues presented and considered by district court).

matory retest, and a limitation on discharge or discipline without a confirmatory retest. Minn.Stat. §§ 181.953. In light of all these considerations, we conclude that the district court did not err in granting summary judgment for the county on the Fourth Amendment claim.

## DECISION

We conclude that the establishment of a random drug-testing policy under the Workplace Testing Act is an inherent managerial right and not subject to collective bargaining under PELRA. As to the implementation of the policy, the categorization of which positions are "safety sensitive" is so intertwined with the establishment of the policy as to be equivalent to its establishment and not, therefore, subject to collective bargaining. But in other areas not covered by the Workplace Testing Act, the implementation of the policy may be separated from the policy's establishment and thus requires collective bargaining as provided by Minn.Stat. § 181.955, subd. 1 (2004). As to those areas, the county committed an unfair labor practice by refusing to meet and negotiate with the union. Finally, the application of the random drug-testing policy to employees who occupy "safety-sensitive" positions does not violate the employees' Fourth–Amendment rights.

**Affirmed in part, reversed in part, and remanded.**