*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0866**

Nicholas Bruce Morse, petitioner,
Appellant,

vs.

Commissioner of Public Safety,
Respondent

**Filed May 11, 2015
Affirmed; motion denied
Ross, Judge**

St. Louis County District Court
File No. 69DU-CV-12-3006

Samantha J. Schmidt, Bruno Law, Minneapolis, Minnesota (for appellant)

Lori Swanson, Attorney General, Jacob Fischmann, Assistant Attorney General, St. Paul,
Minnesota (for respondent)

Considered and decided by Kirk, Presiding Judge; Ross, Judge; and Reilly, Judge.

**U N P U B L I S H E D   O P I N I O N**

**ROSS**, Judge

State trooper Nicholas Morse drove his patrol car to a training session and arrived

apparently intoxicated. A superior officer administered field sobriety tests and arrested

Morse for drunk driving. The commissioner of public safety revoked Morse's driver's

license and the district court affirmed over Morse's argument that his breath test results

should be suppressed because the state patrol did not comply with the drug-and-alcohol workplace-testing statute. We need not decide whether chemical testing to verify a suspected workplace violation under that statute is subject to judicial review in an implied-consent proceeding. We instead affirm because, regardless of that issue, the record establishes that Morse's supervisor validly tested him to investigate his suspected drunk driving under the criminal and administrative impaired-driving statute.

## FACTS

Trooper Nicholas Morse was scheduled to begin a law enforcement training session at 8:00 on a September 2012 morning in Duluth. Morse arrived in his squad car about ten minutes late. Lieutenant Quint Stainbrook asked Morse for his portable radio so it could be reprogrammed. Morse left the building and the lieutenant waited several minutes for him to return. Lieutenant Stainbrook gave up waiting and went to the training room, where another trooper reported to the lieutenant that he smelled alcoholic beverages on Morse.

Morse finally returned and entered the training room at 8:30. He chose a seat on the far side of the room away from the lieutenant and the other troopers. Lieutenant Stainbrook motioned Morse closer and again asked for his portable radio. Morse said that he had locked his keys in his squad car. The lieutenant smelled the odor of an alcoholic beverage on Morse's breath. He asked Morse for his squad car number so he could find the correct spare key. Morse had trouble remembering the number.

Lieutenant Stainbrook told Morse to retake his seat and informed others about the odor on his breath. Lieutenant Jason Hanson, Captain Steven Stromback, and Sergeant

2

John Magaard called Morse out of the meeting at 9:20. Hanson immediately noticed the odor and Morse's bloodshot, watery eyes. These troopers took Morse to an office. Captain Stromback and Lieutenant Hanson left Morse with Sergeant Magaard, a union representative, to discuss union matters.

Meanwhile, Lieutenant Stainbrook found the spare key to Morse's squad car and went outside. He noticed that Morse had "parallel" parked the car irregularly, with the closest front tire near the curb and the rear tire angled out about six feet away. When the lieutenant opened the car door he found the radio playing and the ignition lights still on because Morse had failed to turn the key to the off position. He also smelled the odor of an alcoholic beverage inside the car.

Captain Stromback and Lieutenant Hanson returned to the office where they had left Morse with Sergeant Magaard. Lieutenant Hanson activated an audio recorder, and Captain Stromback read Morse a portion of the union contract concerning alcohol testing. Morse submitted to a preliminary breath test, which revealed an alcohol concentration of .099.

Morse asked Lieutenant Hanson about his job status, and the lieutenant told him that "that would be determined at a later date," and he added, "We [are] only going to . . . deal with the current situation at hand today." He took Morse outside to administer field sobriety testing. He administered the horizontal-gaze-nystagmus test, walk-and-turn test, and one-leg-stand test. Although Morse performed the two physical tests well, the nystagmus test corroborated the suspicion that he was intoxicated. Lieutenant Hanson arrested Morse for impaired driving and took him to the St. Louis County Jail. There he

3

read Morse the implied-consent advisory and offered him the opportunity to speak with an attorney before deciding whether to submit to a breath test. Morse asked to speak to an attorney, made one phone call, and then said he would take the test. The breath test indicated an alcohol concentration of .08, and the commissioner of public safety consequently revoked Morse's driver's license.

Morse petitioned for judicial review. He challenged the revocation on the theory that the preliminary and final breath tests could not be admitted in his implied-consent proceeding because those tests did not comply with the procedures authorized in the Minnesota Drug and Alcohol Testing in the Workplace Act, Minnesota Statutes sections 181.950 through 181.957. The district court rejected Morse's argument and affirmed the revocation, concluding that Morse's challenge under the workplace-testing statute was "outside the limited scope of an implied consent judicial proceeding." Morse appeals his revocation.

## D E C I S I O N

Morse contends that the Minnesota State Patrol violated the workplace-testing statute by conducting alcohol tests on Morse as its employee outside the authority afforded to employers by that statute. The district court appears correct that a challenge under the workplace-testing statute falls outside the ten enumerated issues eligible for judicial review in an implied-consent hearing. *See* Minn. Stat. § 169A.53, subd. 3(b) (2014); *Axelberg v. Comm'r of Pub. Safety*, 848 N.W.2d 206, 208–09 (Minn. 2014). But we need not resolve that legal issue here. This is because, even if Morse were correct that penalized drivers generally can raise the challenge in an implied-consent revocation

4

proceeding, the challenge could not stand on the facts of this case because the alcohol testing is authorized independently by the criminal and civil provisions allowing chemical testing of suspected drunk drivers.

The legislature authorizes at least two chemical testing processes. One can occur in the impaired-driving setting. Minn. Stat. § 169A.51 (2014). The other occurs in specified employment settings. Minn. Stat. § 181.951 (2014). The two laws stand independently. Each satisfies a different public policy and ends with a different result. As for public policy, the workplace-testing statute promotes reliability and fairness to employees when employers seek chemical testing. *See Law Enforcement Labor Servs., Inc. v. Sherburne Cnty.*, 695 N.W.2d 630, 639–40 (Minn. App. 2005). By contrast, the impaired-driving law promotes roadway safety. *See Goldworthy v. State, Dep't of Pub. Safety*, 268 N.W.2d 46, 49 (Minn. 1978). Regarding results, one of these statutes establishes a process that may lead to workplace discipline (without regard to the privilege to drive), while the other details a process that may lead to criminal penalties and license revocation (without regard to employment).

Morse does not dispute that a person tested under the impaired-driving law is subject to license revocation. He argues instead that, because he spoke to a union representative and was read a portion of the union contract before testing, the test was conducted for employment purposes. And because the test did not satisfy the formalities of the workplace-testing statute, the result must be suppressed. We observe that Morse points to nothing in the workplace-testing statute that directs courts to suppress evidence collected in violation of that statute, and suppression is not a remedy identified in the law.

5

*See* Minn. Stat. § 181.956 (2014). But again, we can reject Morse's arguments based on the facts regardless of any legal deficiencies. Morse's cited facts do support his view that the investigation had at least some flavor of a workplace inquiry. But they also plainly indicate the investigation had a markedly criminal nature: a law enforcement officer subjected Morse to the same field sobriety tests that officers regularly administer to investigate suspected drunk driving; he told Morse that the status of his employment was a different matter; he placed Morse under arrest for drunk driving after the field tests established his intoxication; he took Morse to jail; he read Morse the implied-consent advisory; he gave Morse the opportunity to contact an attorney; and he administered to Morse the same final breath test that law enforcement officers routinely administer to suspected drunk drivers. The testing process completed a criminal investigation under the impaired-driving statute. That the arresting officer might be considered a supervisory agent of Morse's employer does not defeat the fact that he was also a policing agent of the state. And Morse points us to nothing in either the impaired-driving statute or the workplace-testing statute that hints any support for the idea that the two laws are mutually exclusive. Perhaps if Morse were challenging a resulting employment suspension or discharge, his arguments about the workplace-testing law might carry some weight. But not here.

We add that Morse's statutory argument has an absurd ending. As a matter of public policy, the supreme court has concluded that the impaired-driving law must be "liberally interpreted in favor of the public interest and against the private interests of the drivers involved." *State, Dep't of Pub. Safety v. Juncewski*, 308 N.W.2d 316, 319 (Minn.

6

1981). Despite this safety concern, Morse would have us suppose that the legislature intends the state's impaired-driving law to penalize every conceivable drunk driver operating any kind of motor vehicle *except* for drunk law enforcement officers operating police cars. Preposterous.

Morse cannot save his unconvincing argument by his assertion that the troopers should have called on some other policing agency to investigate his suspected impaired driving to avoid triggering the workplace-testing statute. Again, even if the workplace-testing statute was triggered, the impaired-driving statute was also triggered with no apparent operational conflict between the two.

Morse's addendum to his appeal brief includes the part of the state troopers' union contract that contains the drug-and-alcohol-testing policy. The commissioner has moved to strike this document along with references to it in Morse's brief. We depend only on facts in the record, and parties do not effectively enhance the record by merely including extraneous material in their appeal submissions. *See* Minn. R. Civ. App. P. 110.01 ("The documents filed in the trial court, the exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases."). Although we have occasionally entertained motions to strike noncomplying submissions, we more commonly simply disregard attachments and references that are beyond the record. We therefore deny the commissioner's motion to strike but reiterate that we base our opinion only on the record.

**Affirmed; motion denied.**